UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
                       X

UNITED STATES OF AMERICA

             V.

DA'QUAN JOHNSON,
        Defendant
_____X

14-cr-476 (CS)

                X

                X

## DEFENDANT'S SENTENCING MEMORANDUM

Russell T. Neufeld
99 Hudson street - 8th Floor
New York, NY 10013
(646) 613-8359

Mitchell J. Dinnerstein
20 Vesey Street - Suite 400
New York, NY 10007
(212) 925-0793

Counsel for Da'Quan Johnson

# Russell T. Neufeld
## Attorney at Law

April 14, 2016

Honorable Cathy Seibel
United States District Judge
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

> Re: *United States v. Da'Quan Johnson*
>      14-cr-476 (CS)

Dear Judge Seibel:

Da'Quan Johnson is scheduled to be sentenced by the Court on April 28, 2016 following his plea of guilty on January 7, 2016 to violating 18 U.S.C. §1962(d), racketeering conspiracy and 18 U.S.C. § 1959(a)(5), conspiracy to murder in aid of racketeering. Because of the compelling mitigating factors in Da'Quan Johnson's background, a sentence substantially below the thirty year statutory maximum would be just, appropriate and sufficient, but not greater than necessary to comply with the sentencing objectives enumerated in 18 U.S.C. § 3553(a).

## STATEMENT OF FACTS

**Background**

Da'Quan Johnson was born to a 15 year old, single, heroin addicted, mentally ill mother who utterly failed to provide the minimum essentials all children need and deserve. [1] Mr. Johnson's mother, Keisha Hubbard, was, herself, born to a drug addicted mother. She was sexually abused as a child. She became pregnant with Da'Quan when she was only14 years old. Ms. Hubard had just turned 15 when she gave birth to Da'Quan. She has been addicted to drugs and mentally ill since childhood. Her whole life has been a revolving door of jails and psychiatric hospitals , interspersed between periods of totally neglectful parenting in a dysfunctional environment. Although Child Protective Services was aware for several years that Da'Quan and his siblings were suffering from parental neglect and dangerous levels of lead for which their mother refused to have them tested or treated, it was not until Da'Quan was eight years old that

---

[1] We urge the Court to review carefully the very thorough and documented social history report by Melissa Lang, LMSW attached as Exhibit 1; upon which this background section relies. The report details the many years of parental and social services neglect, the years of exposure to lead poisoning and the over all dysfunctional home environment in which Da'Quan grew up. Rather than just repeating Ms. Lang's report of Da'Quan Johnson's horrific youth, we rely on the attached report. .

99 Hudson Street • 8th Floor • New York, NY 10013 • Tel. 646-613-8359 • Fax: 212-965-9084 • rneufeld@neufeldlawoffice.com

he and his siblings were finally removed from Ms. Hubbard. Ms. Hubbard obstructed lead poisoning testing and treatment for several years. Early intervention by CPS most likely would have resulted in a better outcome for Da'Quan. Early school records demonstrate that Da'Quan was bright and hard working despite very poor attendance. It was clear that Da'Quan's mother did not have the wherewithal to get Da'Quan to attend school regularly. When he did get to school it was due to his own efforts, rather than his mother's. As the oldest child, he also became responsible when he was only six and seven years old, for trying to get his younger siblings fed, dressed and to school as well as to care for himself. The school records show that when the children did go to school they were frequently improperly and inadequately clothed and smelled of urine. Da'Quan Johnson's early role as a care giver was to help define his life, up to and including his gang involvement and his relation to his own children.

After being removed from his mother at age eight, Da'Quan was placed in foster care and then placed with his maternal grandparents. Because they were recovering drug addicts and alcoholics themselves, with a drug addicted, mentally ill. daughter, Da'Quan's grandparents were very strict with him and his siblings. Their discipline included the use of corporal punishment. As a result, when Da'Quan and his brother James were able to, they went back to live with their mother. When Da'Quan was 15 and James 14, they were living with their mother when the Yonkers police came to arrest her. Though the children were present in the apartment at the time of the arrest, the police failed to alert Child Protective Services or the grandparents to their situation. Keisha Hubbard spent the next eight months in jail and the children, Da'Quan and James, were left to fend for themselves. As children looking for some guidance and some sense of family, it is not surprising that it was during this period, that the boys began associating with other similarly situated children, some of whom were youth gang members. It, also, marked a period of further decline in Da'Quan's school performance and attendance .

When Da'Quan was 16 in 2007, he was arrested for the first time. It was for disorderly conduct. In the subsequent 7 years, leading up to his present arrest, he was arrested 12 more times. Six of these were for trespassing in the Schlobohm housing project, where he lived, though his name was not on the lease. Three of the arrests were for small amounts of marijuana. As explained in Ms. Lang's social history report, these arrests reflect the level of harassment Da'Quan suffered from the Yonkers police. They help explain why he and his friends did not view law enforcement as a potential source of protection from older, established gangs.

Since 2010, Da'Quan Johnson has been in a primary relationship with Janet Cosme. Ms. Cosme works as a phlebotomist and is the mother of Da'quan's two children. In its early period their relationship was often tumultuous and included a drunken assault on Ms. Cosme with a screw driver. The current relationship is much more positive and stable. They have been able to resolve their earlier conflicts and work well together in parenting their two children (Exhibit 2).

In 2012 Da'Quan Johnson was convicted of 3rd degree robbery. While in the Westchester County jail, he enrolled in the young offender program and a poetry writing workshop taught by volunteer instructors from Sarah Lawrence. He produced a significant body of poetry during the

class, which won critical praise from his teachers[2] One of the poems, entitled "The Love of My Life" demonstrates the devotion Mr. Johnson feels for his then only child and is included in Exhibit 1 at page 16. Although incarcerated, Da'Quan Johnson continues to play as active a role as possible in his children's lives.

## Offense Conduct

The group of teenagers that became known as the Grimy Mother Fuckers (GMF) started as a group of friends in and around the Schlobolm (known as "slow bomb") housing project in Yonkers. The project was/is incredibly impoverished and many of the other boys, like Da'Quan, suffered from parental neglect, harassment from members of older, established gangs and from the Yonkers police. To survive in this hostile environment, these children were driven to join together for mutual protection, companionship and support. Yonkers was divided among a number of rival gangs based in different neighborhoods. The dominant gang in the Schlobohm houses was the Strip Boys. The Strip Boys was composed of members a generation older than the GMF children and the two groups became allied, with the GMF assisting the Strip Boys in fights with other gangs and aiding the Strip Boys drug selling, while being afforded the older group's protection.

In 2012 federal authorities arrested 20 members of the Strip Boys on firearms and drug charges. This effectively decimated the gang and created a perceived power vacuum in the Schlobohm houses that rival gangs sought to fill. This, in turn, prompted an increase in violent attacks by the rival gangs on the GMF and in the area of the Schlobohm houses, prompting acts of retaliation by the GMF.[3] The GMF essentially became a youth gang of "gang bangers" involved in fights with rival gangs, rather than a narcotics enterprise (PSR ¶ 32). The GMF was a loosely constructed group, that lacked any formal leadership structure. To the extent that Da'Quan was a "leader" of the GMF, he was respected by other members because he was intelligent and known for taking care of his fellows, as he had of his siblings. He engaged in acts of violence against members of rival gangs and, occasionally, was involved in the sale of marijuana. Da'Quan perceived the use of violence as a means of self-protection in an unfriendly, hostile environment.

On December 27, 2013, a number of gun shots were fired in the vicinity of the Schlobohm houses, presumably by members of the rival Highland gang. To retaliate, Da'Quan Johnson, Percy Baker, Antoine Watkins and Kenneth Moore went to a school yard in the vicinity of Highland Avenue and Jackson Street in an area of Yonkers considered to be the Highland gang's territory. There, where a candlelight vigil was being held, Percy Baker fired a gun into the

---

[2]     Some of the poetry and the teacher comments were seized by the government during the arrest in the instant matter. They were provided to the defense in discovery.

[3]     See, "Three Charged In White Plains Federal Court In Connection With December 2013 Homicide," U.S. attorney's Office press release, July 17, 2014.

crowd of people assembled, intending to shoot Tommy Baker, the leader of the Highland gang. Instead he shot and killed Tyrone Arthur - a person completely uninvolved in the gang rivalry.

## Plea Agreement and Presentence Report

On January 7, 2016, Da'Quan Johnson entered into a plea agreement. He pled guilty to Counts One and Three of the indictment. Count One charged a racketeering conspiracy pursuant to 18 U.S.C. § 1962(d) which carries a maximum prison term of 20 years. Count Three charged conspiracy to commit murder in aid of racketeering pursuant to 18 U.S.C. § 1959(a)(5) and carries a maximum prison term of 10 years; for a total maximum prison term of 30 years. There is no minimum sentence. The agreement stipulated that the sentencing guidelines offense level is 44 and the criminal history category is VI. The parties agreed that the effective stipulated guideline sentence is 30 years. The agreement permits the defendant to seek a sentence below the guideline sentence.

The Probation Office's Presentence Report concurs with the plea agreement stipulated offense level of 44 and a criminal history category of VI, although it reaches that conclusion by a somewhat different computation (PSR ¶132). It recommends a sentence of 360 months. In the Adjustment to Incarceration section, the PSR notes that Da'Quan Johnson was disciplined five times since being incarcerated. One of those was for rough housing with his brother James, who was his cell mate at the time and is his co-defendant. The other occasions were all for using other inmates telephone time.

Notably, the PSR concludes that "Mitigating circumstances regarding the offense and the defendant's social circumstances may warrant a variance from the applicable sentencing guideline range" (¶ 148). Unfortunately, as we explained in our objection letter (Exhibit 3), the PSR "fails to include some of the most significant facts that support that conclusion." As we had provided the Probation Office with an earlier version of our social history report (PSR ¶ 102), we believe that the most compelling, mitigating facts should have been included in the Personal and Family Data section and when they were not, the breadth of our objection should have been included in the Addendum to the Presentence Report. The Addendum, also, inaccurately states the defense objection to the offense conduct section by stating that "the defendant disputes that each specific characterization of each act is wholly *inaccurate* (emphasis added). In fact, what we wrote was that "while Da'Quan Johnson agrees that he engaged in acts of violence in response to violence and threats from other gangs, he does not believe that each specific characterization of each act is wholly accurate."

## ARGUMENT

In determining a just sentence for Da'Quan Johnson, the Court will certainly hold him responsible for his participation in the GMF and the murder of Tyrone Arthur. However that responsibility is substantially mitigated by the horrendous formative childhood he endured in the care of a mentally ill, drug addicted, recidivist mother. Any child who was raised in such a

chaotic environment would be deeply affected and handicapped. Da'Quan Johnson's responsibility is also mitigated by the shared failure of the community, government agencies and law enforcement to fulfill their responsibility to positively intervene in this family disaster.

As detailed in Melissa Lang's social history report, the Department of Social Services had indicated reports of abuse and neglect beginning when Da'Quan was two years old. Over the following six years Da'Quan and his siblings were found to be exposed to poisonous levels of lead. Their mother engaged in a protracted refusal to have them treated or tested. Ms. Hubbard refused court ordered mandated preventive services saying she did not want anyone " in her business because they will be looking for things to take children away." Child Protective Services tolerated Ms. Hubbard's obstructionism for far too long. So, in his formative years from birth to eight, social services completely failed Da'Quan Johnson. As the social history report notes, the effects of lead poisoning include diminished impulse control, emotional regulation and decision making. These deficits, in turn result in a related increase in criminal conduct. Along with a chaotic home life and a mother who displayed the same behavior, the effects of lead poisoning seem to have manifested themselves by 6th grade. During 6th grade, Da'Quan was still evaluated as a " conscientious student," while at the same time getting in trouble for disruptive and inappropriate behavior. The lead poisoning effects were certainly a contributing factor for the teenage Da'Quan and could well have contributed to the violent, tit for tat youth gang culture in which the GMF participated.

The relation of the Yonkers police to Da'Quan and the other young black boys in the Schlolbohm project only exacerbated the problem. Rather than building relations of trust with these children, the police behavior, in Da'Quan's case - repeated arrests for trespassing, disorderly conduct and marijuana - bred fear and mistrust. When teenagers don't feel they can rely on law enforcement to protect them, they are much more likely to rely on their peers for protection. This often leads to joining youth gangs. When the Yonkers police arrested 15 year old Da'Quan and 14 year old James's mother, and left the children alone in the apartment, they were not only breaking police and social service rules, they were demonstrating the belief that these children were expendable and undeserving of protection. As cited in Ms. Lang's report, it was during this period that repeated complaints of racial discrimination and the excessive use of force by the Yonkers police, resulted in a Justice Department investigation of the Yonkers department. The Yonkers police functionally worked to maintain the system of apartheid that survived in that city for many years in defiance of federal court orders to de-segregate.

It is easy to look at Da'Quan Johnson's arrest record and see only a lengthy criminal history. But, just as Ms. Lang's social history report explains the underlying causes of the minor offences, so even the more serious conviction - that for 3rd degree robbery - reveals another side of Da'Quan Johnson. It was during his time in jail for that offense that Mr. Johnson, then 21 years old, enrolled in the Sarah Lawrence poetry writing class. In addition to the poem about his love for his son, reproduced in Exhibit 1, page 17, Da'Quan also used the class to reflect on his

past behavior and to affirm his commitment to change.[4] Da'Quan Johnson's poetry reveals a side of him that is quite at odds with his criminal behavior. Just the fact of enrolling in a Sarah Lawrence poetry class, is not what is commonly associated with a violent gang member. Rather, it reveals the strong potential for redemption and rehabilitation that exists within this young man. His ability to care for others, which began with his taking responsibility for his younger siblings, has continued into his parenting. As his partner, Janet Cosme relates in her letter to the Court (Exhibit 2), "...he helped watch the children while I worked, he made sure they ate, and they where clean and ready for bed when I got home. He helped clean and even cooked." This again shows a side of Da'Quan Johnson that greatly contrasts with his illegal behavior. It should add to the Court's confidence that once released from custody, Da'Quan Johnson will not pose a threat to the community, but, rather, will take on his role as a responsible member of the community.

Taking into account the factors the Court must consider in determining a just sentence (18 U.S.C. § 3553(a) requires some fine and difficult balancing in this case. The nature and circumstances of the offense are as serious as they can be. Because of Da'Quan's behavior, along with the reckless behavior of others, Tyrone Arthur, a completely innocent human being, lost his life. It is only when that event is seen in the context of all that preceded it and defined Da'Quan Johnson's life, that the crime is fully understood and mitigated. The Court can arrive at a sentence that reflects the seriousness of the crime, affords adequate deterrence, protects the public and gives due consideration to the non-binding sentencing guidelines or the lengthy maximum sentence, while at the same time affording great weight to the social forces that devastated Da'Quan Johnson's early life. The Court can hold Da'Quan Johnson responsible for his behavior while, at the same time, finding the shared responsibility of the larger community, local government and local law enforcement for their role in the process that led to the events of December 27, 2013.

## CONCLUSION

For all the above reasons, we ask this Court to impose a sentence substantially below the maximum sentence of thirty years.

Respectfully submitted,

*Russell Neufeld*

Russell T. Neufeld

*Mitchell Dinnerstein (RN)*

Mitchell J. Dinnerstein
Counsel for Da'Quan Johnson

---

[4]     "I am more than just an inmate/More than just a number/Where I'm from we are used/To the pain/The rain, lightning, and thunder/I'm special to those who love me/And hated by those who don't/I've learned to love and care for/Those I've always said I won't"

cc.: AUSA Scott Hartman by e-mail
     AUSA Douglas Zolkind by e-mail
     USPO Nichole Brown-Morin by e-mail
     All counsel by ECF