

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*United States Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

April 26, 2016

**BY ELECTRONIC MAIL**
The Honorable Cathy Seibel
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

        Re:    **United States v. Da'Quan Johnson**,
                14 Cr. 476 (CS)

Dear Judge Seibel:

      The Government submits this letter in connection with the sentencing of defendant Da'Quan Johnson, scheduled for April 28, 2016 at 10:00 a.m. For the reasons set forth below, the Government submits that a Guidelines sentence of 360 months would be sufficient but not greater than necessary to serve the purposes of sentencing.

## Background

      On July 16, 2014, a federal grand jury sitting in this District returned indictment 14 Cr. 476 charging Da'Quan Johnson and Kenneth Moore with conspiracy to commit murder in aid of racketeering and aiding and abetting the murder of Tyrone Arthur, both violations of Title 18, United States Code, Section 1959. Johnson and Moore were also charged with a firearms offense, in violation of Title 18, United States Code, Section 924(j). Johnson was arrested on July 17, 2014, and was presented before the Honorable Judith C. McCarthy, who ordered him detained pending trial.

      On December 10, 2014, the grand jury returned superseding indictment S1 14 Cr. 476. The superseding indictment contained the same offenses charged in the original indictment and also charged Johnson, Moore, and eleven co-defendants with participating in a racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d), as well as using and carrying firearms in furtherance of that conspiracy, some of which were discharged.

      On January 7, 2016, Johnson pled guilty before this Court to participating in the racketeering conspiracy and in the conspiracy to murder rival gang members that resulted in the death of Tyrone Arthur. The combined maximum sentence of incarceration permitted by statutes on those two counts is 30 years.

Honorable Cathy Seibel
April 26, 2016
Page 2 of 8

## Offense Conduct

From approximately 2008 up until his arrest in late 2014, Da'Quan Johnson was a leading member of the Grimey Motherfuckers or "GMF." GMF is a criminal organization whose members and associates engaged in, among other activities, narcotics trafficking, murder, attempted murder, and assault with dangerous weapons. As described below, GMF is a local, street-level gang that operated in and around the Schlobohm Housing Project in Yonkers, New York.

GMF, as a street gang, was formed in or about 2008 by a group of young men who were involved in street robberies, assaults, and sales of marijuana, crack and other drugs. At its inception, GMF was aligned with the Strip Boyz, a different street gang that was likewise based in the Schlobohm Housing Project and was made up of members one generation older than most GMF members. GMF and the Strip Boyz controlled crack cocaine and marijuana sales in and around the Schlobohm Housing Project by prohibiting and preventing non-members, outsiders, and rival narcotics dealers from distributing crack and marijuana in the area.

During their alliance with the Strip Boyz, GMF members committed shootings and other acts of violence to protect the territory that they shared with the Strip Boyz, to protect their narcotics and narcotics proceeds, and to intimidate rival gang members, including members of the Cliff Street Gangsters ("CSG") and the Elm Street Wolves ("ESW"), two gangs from the east side of Nepperhan Avenue. Not only did GMF members carry out their own acts of violence against these rival gangs, they also assisted the Strip Boyz in achieving their objectives by, among other things, distributing narcotics, holding firearms, and, in at least one instance, removing evidence from the scene of a shooting committed by a prominent member of the Strip Boyz.

Over time, GMF developed into a violent street gang that was ultimately defined less by narcotics distribution and more by shootings and other acts of violence perpetrated against rival street gangs. GMF members protected their territory in the Schlobohm Housing Project through violence, and its members have committed various crimes within and around that territory, including robberies, assaults, larcenies, and narcotics trafficking. Certain members and associates of GMF maintained and shared firearms in order to protect their territory and, specifically, to protect themselves against rival gang members. When a firearm was needed to protect their territory from encroachment by a rival gang, members of GMF were able to utilize the firearms acquired and stored by other members. Certain GMF members also continued to sell crack, marijuana and other drugs in the Schlobohm Housing Project and on a "strip" of Palisade Avenue that runs alongside the housing project.

In late June and early July 2012, twenty members of the Strip Boyz were arrested on charges of narcotics distribution and/or firearm offenses in a case captioned *United States v. Mark David*, S1 12 Cr. 214 (ER) (S.D.N.Y.).

Honorable Cathy Seibel
April 26, 2016
Page 3 of 8

The federal arrests of the Strip Boyz left GMF the dominant gang in the area around the Schlobohm Housing Project. GMF members, led by Da'Quan Johnson continued to engage in acts of violence and intimidation to preserve the dominance of the Schlobohm Housing Project and the surrounding areas that they previously shared with the Strip Boyz. Above all, GMF members were aligned in their disputes with rival gangs in southwest Yonkers. GMF members had disputes with gang members from various nearby neighborhoods, including: Cottage Place Gardens, Warburton Avenue, Highland Avenue, and Riverdale Avenue. These disputes resulted in a number of violent incidents among the gangs, including assaults, stabbings and shootings.

Of particular significance, from approximately 2008 to 2014, GMF was engaged in a violent dispute with members of a rival gang from Highland Avenue known simply as "Highland." The dispute began in or about 2009-10 when Jameke Brown began hanging out with GMF members, including Da'Quan Johnson and his brother, James Johnson. Brown had an ongoing dispute with members of Highland, and GMF inherited the dispute. The dispute led to multiple violent acts by members of GMF targeting members of Highland.

Most significantly for present purposes, the dispute between GMF and Highland led to the murder of Tyrone Arthur on December 27, 2013. Arthur was not himself a member of any gang. Rather, he was an innocent bystander who was killed by a stray bullet intended for Thomas Baker, a leader of the Highland Crew. The Government's investigation revealed the following information about the murder of Arthur:

> On December 27, 2013, a group of unidentified males fired off multiple rounds in the heart of GMF territory at Elm Street and Palisade Avenue. Word quickly spread through southwest Yonkers that members of the Highland Gang were responsible for the shooting, including Thomas Baker, a/k/a "Tommy B," and Andre Pert, a/k/a "Um."
>
> A short time after the shooting, Da'quan Johnson and Moore got in Moore's car along with fellow GMF members Percy Baker and Antoine Watkins. After dropping off an associate, Baker and Johnson talked about the fact that they were tired of members of the Highland Gang coming to GMF territory and shooting. They decided to retaliate by shooting up Highland territory. Initially, they did not plan to shoot anyone in particular; rather they planned to shoot any rival gang members they happened to see. Moore told Baker and Johnson that if they wanted to shoot up Highland, he was with them.
>
> Da'quan Johnson directed Moore to a particular building on Caryl Avenue in Yonkers where a girlfriend of Johnson's lived. When they arrived outside the building, Johnson made a telephone call and, a short time later, Johnson's girlfriend pulled up. Johnson spoke to the woman briefly and then told Baker to go upstairs to a particular apartment. At the apartment, Baker was met by another woman, who produced a grocery bag containing a black revolver with a brown handle. Baker took the gun and returned to Moore's car.

        Moore then drove Baker, Da'Quan Johnson, and Watkins to Groshon Avenue.  Baker and Johnson got out of the car and ran across the school yard.  They hid behind a building not far from the intersection of Highland Avenue and Jackson Street.  Johnson peered around the corner of the building and relayed to Baker, whose view was blocked by the building, who from the Highland gang was present in the area and where they were standing.  The intersection was crowded with citizens who were attending a memorial service for a neighborhood resident who had been killed in a motorcycle accident.

        Acting at Johnson's direction, Baker stepped out from behind the building and started shooting.  He was aiming for Tommy B, a member of the Highland Crew who was attending the vigil.  Baker was far away for the first two shots; Johnson repeatedly encouraged him to move closer.

        Although Baker did not hit Tommy B or any other member of the Highland gang, he did hit Tyrone Arthur, who was sitting in his car near the intersection.  Arthur was shot in the lung, and was dead by the time that law enforcement arrived on the scene.

In addition to his participation in the murder of Arthur, Da'Quan Johnson personally committed and oversaw multiple other acts of violence on behalf of GMF or its members.  Specifically:

- Early in the dispute between GMF and Highland, the Johnson brothers beat up and robbed two Highland members and Da'Quan participated in multiple other assaults of Highland members.  The violence later escalated and in about June of 2009, Da'Quan went to Highland Avenue territory along with other GMF members, where he shot up the block.

- On July 9, 2009, Da'Quan commissioned a fellow GMF member, Robert Funchess, a/k/a "Pop," to shoot Rinald Snipes, a/k/a "Money," a member of the Highland gang.  Snipes and a fellow Highland member, Yahmale Gentle, a/k/a "Yaya," were both shot in the thigh.  Gentle was also shot in the arm.

- On March 5, 2010, Da'Quan shot Audai Howard, a/k/a "Buck," a member of the Cliff Street Gangsters in the left leg as part of the dispute between the GMF and the CSG.  (Howard recovered.)

- In about 2012 Da'Quan, along with fellow GMF member Ronnie King, a/k/a "Banga," also robbed Strip Boy Joel Urena, a/k/a "Boss."  The incident touched off a dispute between the Strip Boyz and GMF that ended with Strip Boy Jose Cruz, a/k/a "Chili" threatening several GMF members with a semiautomatic weapon.

- During the summer of 2014, Da'Quan got into a shootout with Derven Thompson, a/k/a "Diggy," a leading member of the Cruddy 650 gang, which was involved in a dispute with GMF.  No one was hit during the shootout.

Moreover, in July 2014, in connection with the arrests of Da'quan Johnson and James Johnson on charges related to the murder of Tyrone Arthur, FBI agents conducted a search of the apartment that they shared and discovered, among other things, marijuana packaged for distribution and a Bryco Arms .380-caliber handgun.

### The Presentence Investigation Report and the Defendant's Objections Thereto

In Presentence Investigation Report (the "PSR"), the Probation Office joined the Government in calculating that the recommended sentence applicable to Da'Quan Johnson under the Sentencing Guidelines is 360 months, which is the maximum sentence available for the particular offense of which Johnson was convicted.

Although the defendant has lodged a general objection to the PSR's descriptions of violent acts perpetrated by the defendant, he has not specified particular areas of factual dispute. To the extent there are any such areas, the Government will be prepared to discuss them at sentencing.

### The Appropriate Sentence

Although the Guidelines no longer play a mandatory role at sentencing, they nevertheless continue to play a critical role in trying to achieve the "basic aim" that Congress tried to meet in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." United States v. Booker, 543 U.S. 220, 252 (2005). "Pursuant to the 'remedy opinion' [in Booker], the now advisory Guidelines are to be considered together with the other factors set forth in 18 U.S.C. § 3553(a), by judges fashioning sentences." United States v. Fernandez, 443 F.3d 19, 26 (2d Cir. 2006); see also Booker, 543 U.S. at 261-62. Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall v. United States, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. Id. at 596; see also United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (the Guidelines "'cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors and, with important exceptions, their calculations were based upon the actual sentences of many judges.'") (quoting United States v. Jiminez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc)); see also Fernandez, 443 F.3d at 33-34 ("It was not error for the [District Court] to employ the Guidelines range as a starting point and then to determine whether the arguments presented pursuant to the § 3553(a) factors warranted 'lighten[ing]' of . . . or fashioning of 'an alteration to' . . . the advisory Guidelines sentence").

The Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be

Honorable Cathy Seibel
April 26, 2016
Page 6 of 8

reasonable in the particular circumstances." Fernandez, 443 F.3d at 27; see also Kimbrough v. United States, 128 S. Ct. 558, 574 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'") (quoting Rita v. United States, 127 S. Ct. at 2464-65).

Section 3553(a) provides that the sentencing "court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," and then sets forth seven specific considerations:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
>   (B) to afford adequate deterrence to criminal conduct;
>
>   (C) to protect the public from further crimes of the defendant; and
>
>   (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established [in the Guidelines];
>
> (5) any pertinent policy statement [issued by the Sentencing Commission];
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In this case, a particularized consideration of the factors set forth in Section 3553(a) demonstrates that a Guidelines sentence of 360 months is appropriate given the serious nature of the offense and the defendant's own extensive criminal history.

Of paramount importance in this analysis is the nature and circumstances of the offense, which weigh heavily in favor of a substantial sentence. As detailed above, the defendant was a respected and leading member of a street gang whose members, including the defendant himself, committed numerous acts of violence. It is true that much of the violence perpetrated by GMF was targeted at rival gang members who, by choosing to engage in violent crime themselves, might be thought to have assumed the risk that they would be the victims of similar offenses.

But the facts of this case, and the tragic circumstance of Mr. Arthur's death, demonstrate all too clearly that internecine violence among gang members can have devastating consequences for the innocent civilians who are forced to share their streets and communities with these gangs. Indeed, given the sustained nature of the defendant's criminal conduct and the frequency with which he possessed firearms and made firearms available to fellow members of the conspiracy, it is perhaps remarkable that more innocent civilians were not injured as a result of the defendant's conduct.

The history and characteristics of the defendant also weigh in favor of a Guidelines sentence. As noted, the defendant was an active and central member of GMF over a sustained period of nearly six years. During that time, he engaged in multiple acts of violence and participated actively in distributing controlled substances and helping others to do so. Beyond the offense conduct, the defendant has had multiple prior encounters with the justice system. Although many of these encounters appear to have stemmed from relatively minor offenses, the defendant's repeated flouting of the rules governing civil behavior as well as his apparent inability to comply with the terms of prior probationary periods, suggest that a substantial sentence is needed in order to achieve a significant deterrent effect.

The Government recognizes that the defendant's difficult upbringing may shed some light on why he chose to undertake the serious criminal conduct at issue in this case. Certainly, however, there are individuals who were raised in equally difficult circumstances who have not chosen to engage in criminal conduct on the level of the conduct for which the defendant stands convicted here. Moreover, it remains the case that, no matter the explanation for the defendant's actions, the Court has an obligation in imposing sentence to protect the public from further crimes by him. A Guidelines sentence would do just that, by ensuring that the defendant, who showed no signs of discontinuing his violent behavior prior to being charged and arrested in this case, would not be in a position to reoffend for some time.

Finally, the goals of "affording adequate deterrence to criminal conduct" and promoting "respect for the law" more generally are especially important in this case. The defendant was a well-known figure and a leader of one of the most powerful gangs in Yonkers. The members of that gang, GMF, were responsible for a tremendous amount of violence and contributed to a feeling of instability and insecurity in the southwest Yonkers community that the defendant and his family called home. A Guidelines sentence is necessary to send a message to others who might be tempted to join a gang and to engage in violent behavior that if they do so, the consequences will be significant.

Honorable Cathy Seibel
April 26, 2016
Page 8 of 8

      In sum, the defendant is a dangerous individual whose actions contributed to the loss of at least one innocent life and to the general undermining of the social fabric in southwest Yonkers. As such, and for the reasons stated above, the Government respectfully submits that a Guidelines sentence of 360 months would be warranted in this case and sufficient but not greater than necessary to serve the purposes of sentencing.  Thank you for your consideration.

                                  Respectfully submitted,

                                  PREET BHARARA
                                United States Attorney

                     By: /s/
                         Scott Hartman / Douglas Zolkind
                         Assistant United States Attorneys
                         Southern District of New York
                         (212) 637-2357 / (914) 993-1900

CC:    Russell T. Neufeld (by ECF)
        Mitchell J. Dinnerstein (by ECF)